THE FAIRPORT, PAINESVILLE & EASTERN RD. CO. *v.*
MEREDITH.

(Decided July 24, 1933.)

*Messrs. Alvord, Blakely & Ostrander* and *Mr. Harry
T. Nolan,* for plaintiff in error.
*Messrs. Anderson & Lamb,* for defendant in error.

MIDDLETON, J. In the discussion of this proceeding, and for convenience and brevity, the plaintiff in error, The Fairport, Painesville & Eastern Railroad Company, will be referred to as the defendant, and the defendant in error will be referred to as the plaintiff. In the trial court the plaintiff, Mayme T. Meredith, recovered a judgment against the defendant company in the amount of $20,000 as damages for personal injuries which she claimed she received by and through the negligence of the defendant.

We do not regard it necessary to give in great detail all of the surrounding facts involved in this case. The plaintiff received her injuries in a collision with an engine and cars of the defendant company, which were running from a point known as the New York Central Railroad Interchange to a plant in Painesville, Ohio. It may be observed at this time that the defendant's business appears to be chiefly that of a transfer company, as all of its engines are switch engines, and the greater part of the tracks owned by it are claimed to be switches. The collision occurred on July 19, 1929, at a grade crossing at an improved macadam highway sixty feet in width. The plaintiff with her daughter, a young lady of about twenty years of age, approached the crossing in a Packard automobile. The mother was driving the car and was seated on the side of the car nearest to the approaching train. Bordering on the highway, and between the car and the approaching train, was an orchard extending along the highway for a distance of approximately eight hundred feet, and extending back from the highway and along the right of way of the railroad company about the same distance. The mother and daughter were perfectly familiar with their surroundings as they approached the crossing. While there is some dispute in the evidence it seems to be established that at certain distances from the railroad track, and along the

public highway, approaching trains might be seen through the obstruction of the orchard.

Turning attention to the approaching train: It consisted of thirty-two cars, twenty-three of which were loaded with slack coal from mines in West Virginia and were consigned to a plant in Painesville. These loaded cars, with nine empties, were obtained at the said interchange for the purpose, as before observed, of transferring them to their destination in Painesville. A switch engine with tender was pulling the cars, and they were running backward, the tender being the first or leading car in the aggregation of cars. The tender and engine and all of the cars were equipped with air brakes, but no connection had been made for air between any of the cars and the engine when the cars left the interchange. The only control, therefore, of the cars in respect to speed and stopping was in the brakes of the engine and tender. The tender was equipped with a standing board, extending across the front end, and the head brakeman on the train was riding on this board. There was no cab attached to the train, and the conductor and rear brakeman were located on the last car. The engineer and fireman made up the remainder of the crew. While it appears in evidence that the track on which the engine and cars were moving was a switch, it was not surrounded by other switches, or at least the evidence does not so show. In proceeding from the interchange to its destination, it passed through an open country, and it does not appear that the track was running parallel to other tracks. The run to be made was approximately two and one-half miles from the interchange, and at the time of the accident the train had traveled about two miles or more from its starting place. Between the interchange and Painesville it had to make three grade crossings, one of which was route No. 20 from Cleveland to Buffalo, and it appears the highway on which the collision occurred was not an obscure

road, by any means, and it took care of considerable traffic.

We then have under the facts in evidence this situation: An engine and tender equipped with air brakes were pulling thirty-two cars through an open country for a distance of more than two miles; the only available check that could be made in the movement of the cars being the brakes on the engine and tender. It is admitted that at the time of the accident the speed of the cars was ten miles per hour. Additional facts will be referred to in the further discussion of the case.

It is apparent from the evidence of both parties that neither the plaintiff nor the employees of the defendant knew of the approach of the other until just immediately before the collision. There is some difference in the evidence as to the exact position of the automobile on the track when the impact occurred, but there is no dispute that from that instant until the automobile dropped from the tender and the engine stopped it had traveled six hundred and fifty-seven feet from the crossing. It is immaterial whether the automobile was carried or pushed along the tracks of the defendant for that distance. The important fact is that, when the engine stopped, a part of the automobile was under the front of the tender, and up until the instant that occurred the occupants of the automobile had not received any serious injury. During this horrifying experience of being carried or pushed along the track, the mother and daughter were screaming or calling for help, and not until the automobile finally dropped under the tender did their appeals cease. When they were finally removed from under the tender, it was found that the left leg of the mother was severed between the knee and ankle, and the foot remained in the car when she was removed therefrom. Subsequently it was necessary to amputate the leg, by reason of its remaining injuries, and it was finally removed about six inches below her hip. The injuries of the daughter

were not so severe, and the evidence does not establish any great permanent injury to her.

The usual claims were made by the plaintiff of a failure to ring the bell and sound the whistle, and the failure to connect the air brakes was fully pleaded in the petition. By the company the charge of contributory negligence on the part of the plaintiff was made.

The record as a whole is unusually free from error, and particularly is this true in respect to the rights of the defendant. If there was any error in the admission or rejection of evidence, the plaintiff may have some ground for complaint.

It is insisted that the testimony of a railroad fireman and a railroad engineer, who were called by the plaintiff, was incompetent. The substance of their testimony was that an engine and tender properly operated under the conditions described should have stopped the cars from within two to three hundred feet from the point of collision. It is urged that one thing that makes this evidence incompetent is the fact that their interrogation did not include the presence of oil on the track. The answer to this objection is that at that time there was no evidence before the court and jury of any oil on the track. There was no error in the admission of this evidence, and it brings into the case the rule of the last clear chance or known danger. The defendant all through the case and in its briefs has steadfastly maintained that the doctrine of the last clear chance or known danger has no application to the facts involved in this suit.

Complaint is made of the special instructions given before argument at the request of the plaintiff, and the defendant insists that some of such instructions were inconsistent with the instructions given at its request. There is ground for the contention that the instructions referred to are not consistent, but the difficulty with the situation is that the defendant's special instructions one, three and four are clearly erroneous,

for the reason that they exclude any rights whatever under the rule of the last clear chance or known danger.

We now come to consider some matters in the record involving a more serious question. The court in its general charge to the jury said: "There are certain stages of the case where as to some of the questions involved it becomes the duty of the court, however reluctantly under the law, to say to you what construction the law places upon the facts without leaving that question to the jury. Some question has been raised as to whether or not the cars in question were a train engaged in interstate commerce under the laws of the United States. That, in the judgment of the court, is a legal proposition which the court and not the jury must determine and the court must assume the full responsibility for such finding. The court therefore instructs you that the engine and thirty-two cars which the defendant was operating at this time were, in the eyes of the law, a train and engaged in interstate commerce and therefore subject to the law of the United States in that particular."

It is contended that this charge was erroneous and that the cars which were being drawn by the locomotive at the time of the accident did not make a "train." In the sense that term is used in railroad regulations, it may be true that this aggregation of cars did not have the equipment required to make a train. It had no caboose. It had no markers or signals, which the regulations require to identify trains, and it was not running under the continued control of any train dispatcher, or other official, who might have the direction of trains when moving on railroad tracks. But, on the other hand, it is manifest that the movement of these cars was in no sense a switching movement. The defendant was transferring them from the interchange to their destination. It was concluding the run to be made to their destination under the original assign-

ment. While there is some dispute as to whether the cars, when taken at the interchange, were or were not already coupled, yet, whether coupled or not, there is no proof of any switching after they started from the interchange, nor proof that any switching was contemplated from that time until they had traveled a distance of approximately two and one-half miles over open country and across highways carrying heavy traffic.

The Supreme Court of the United States in the case of *United States* v. *Erie Rd. Co.*, 237 U. S., 402, 35 S. Ct., 621, 59 L. Ed., 1019, and more particularly in the case of *United States* v. *Chicago, Burlington & Quincy Rd. Co.*, 237 U. S., 410, 35 S. Ct., 634, 59 L. Ed., 1023, held that the controlling test of whether an aggregation of cars is a train within the provisions of the Federal Safety Appliance Act (Title 45, U. S. Code, Section 1 *et seq.*) rests in the kind of work in which they are at the time engaged, and the character of that work, rather than in the name applied by those interested. In the last case above cited the court also wholly discounts the failure to carry a caboose or markers and impliedly any other of the things that are used by railroads to identify trains from other movements. We are, therefore, under the established facts of the situation as it was when this train proceeded on its way from the interchange, unable to say that it was not a train, and that it was in any sense a switching movement by the defendant.

After having thus instructed the jury, the court then said: ''The laws of the United States require a train so proceeding and having the legal status that this train had to have at least eighty-five per cent. of the cars on such train equipped with air brakes so that by the use of air as applied through these brakes, in addition to the air brake on the engine, the train can be controlled by the engineer. It became therefore the duty of the defendant company in this case in starting this train of cars out to provide that the air brakes on

at least eighty-five per cent. of those cars should be in working order, so that they could be controlled from the engine, and in addition to the air brake on the engine and tender itself, and the failure of the railroad company to so provide the equipment in the manner that it should be used to control, check or stop the progress of the train would, in the eyes of the law, be negligence, and for the direct and proximate consequence of such negligence the defendant company would be liable, the burden of proof being upon the plaintiff to show by preponderance of the evidence that such omission was the direct and proximate cause of the injury to the plaintiff in this case.''

The foregoing part of the charge is also attacked, and it is apparent that, standing alone, it would include a very doubtful legal conclusion. We are not prepared to say that the failure of the defendant to connect eighty-five per cent. of the cars in this train for air service was such negligence as would make the company liable for all of its direct and proximate consequences, unless it should further appear that the plaintiff herself was without fault. The defense of contributory negligence was wholly eliminated by what was then said. However, the court immediately followed the foregoing charge with the following instruction: ''In considering whether such omission in this case was the direct cause you may consider from the evidence in this case what length of time after the plaintiff's perilous position was made known to the crew of the train the train could have been stopped if the air brakes had been in condition to be used and had been used. If the plaintiff was originally at fault there was no negligence on the part of the railroad company as to giving the signal and after the position of the plaintiff was discovered even the application of the air brakes on the train—if the train had been equipped for that purpose—if that had been inefficient to stop the train and have avoided the injury, then, of course,

the failure to equip with air brakes would not be the proximate cause of the injury. It would have happened anyhow, brakes or no brakes.''

Taking the charge quoted as a whole, it plainly indicates that the court had in mind at the time it was given the doctrine of the last clear chance, or known danger, and that said instructions were given with a view of directing the jury to apply that rule. The court had already in a special instruction to the jury and at the request of the plaintiff fully explained to the jury under what circumstances and conditions the plaintiff was entitled to recover, even if she was found to be guilty of contributory negligence. In the charge under consideration, however, the court added to what was said in the special instruction, and said to the jury that the failure of the defendant to comply with the federal statutory requirements might be considered in determining the negligence of the defendant after it discovered the danger of the plaintiff.

Whether pre-existing negligence may be considered in determining responsibility under the known danger rule appears to be a debatable question in the courts. In some jurisdictions recovery is permitted for a pre-existing negligence, while in other jurisdictions it is denied.

Among the cases adopting the latter rule is that of *Illinois Central Rd. Co. v. Nelson* (C. C. A.), 173 F., 915, in which the court held: ''Under the rule that a railroad company may be liable for the injury of a person at a crossing, notwithstanding his contributory negligence, if after actually discovering his peril the servants of the company could by the exercise of ordinary care have avoided his injury, but failed to do so, the company cannot be held liable if such failure resulted from a defect in appliances of the train, which existed previously, and which made it impossible to stop the train in time, notwithstanding the efforts of the trainmen.''

It is stated in the opinion in that case: "A defect in mechanical appliances, existing before and continuing until after the injury, not susceptible of being rectified after the discovery of the danger carelessly incurred and before the injury is done, is not supervening negligence within the rule invoked. Were it otherwise, negligence on the part of others would have to be anticipated and provided for in adopting precautions to prevent accidents; but that is not in the measure of one's duty."

It is obvious, we think, that the controlling principle in the above case rests on the rule that in ordinary negligence the tort-feasor is not bound to anticipate acts of contributory negligence. The instant case depends on facts wholly different in their legal bearing on the rights of the parties involved. We will discuss this question later.

Among the cases which allow recovery, attention is called to *Thompson* v. *Salt Lake Rapid Transit Co.,* 16 Utah, 281, 52 P., 92, 40 L. R. A., 172, 67 Am. St. Rep., 621. That case involved facts very similar to the facts shown in the instant case. A·deaf and dumb boy between the ages of fourteen and fifteen years was struck by a street car of the defendant company under such circumstances as to clearly establish his contributory negligence. As against the company, however, it was shown that the motor and brakes of its car were out of repair, and that, had the car been under proper control, it could have been stopped before colliding with the boy. The court in passing upon this case said: "Appellant's counsel contend that conceding the fact that the defendant was negligent in sending out a defective car, and that the deceased was also negligent in crossing the track in front of the car, in such a case it was the only duty of the defendant, after discovering the dangerous situation of the deceased, caused by his own negligence, to exercise all reasonable care and diligence at his command at the time of the injury,

and that when the motorman did all he could to stop the car, although its brakes were defective, the defendant could not be held liable, even if the car had been sent out in a defective condition with the defendant's knowledge; that, as nothing could be done by the motorman after the discovery of the boy's negligence to remedy the defective condition of the car, all that he was required to do was to use the defective appliances which he had to stop the car; that, if the deceased was guilty of contributory negligence, the unsafe and defective condition of the car, although known to the defendant, was not the proximate cause of the injury.''

The court commenting upon this argument said: ''This position of the able counsel for the defendant is not only ingenious, but is apparently supported by some authority bearing upon the general question of contributory negligence; but we cannot subscribe to such a doctrine when applied to the operation and management of electric cars upon the streets in a city where the lives and safety of pedestrians are largely dependent upon the safe equipment and perfect condition of the appliances with which a street car is propelled, operated, and controlled. If such a doctrine should be established, it would practically place the exclusive right to the use of the street occupied by the street car company in such company, to the exclusion of the citizen. If the citizen used the street, he would do so at the peril of his own safety. If such rules were applicable to contributory negligence, his safety in crossing a street where street cars were operated, with his right to recover damages in case of negligence, would largely depend upon the option of the company to keep its appliances in good repair. In case of his injury by its negligence, the fact of such negligence on the part of the company would be a bar to his recovery in case he contributed to the accident, which the company could, by the use of reasonable care, have avoided.''

In the instant case, we do not have such surroundings as obtained in the Utah case, but we do have a direct violation of a federal statute under which the defendant was required before leaving the interchange to connect for air at least fifty per cent. of the cars in the train, and, because of that mandatory duty, it must be conclusively presumed to have anticipated all consequences of its negligence, which responsibility continued present during all the time it operated the train in its defective condition. When, therefore, the collision happened, it was an existing negligence which made it impossible to save the plaintiff from injury. In the instant case, at most, the plaintiff violated no rule except the natural law to use ordinary care for her own protection, and the defendant violated a federal law enacted for the protection not only of railroad employees, and passengers on railroad trains, but the public generally who are brought in contact with railroads and who might be subjected to danger if such rules were not observed. To hold that the failure to use air brakes after the discovery of plaintiff's danger was not then an act of neglect would abrogate the rule of known danger. It would under such working of that rule free all railroads from any liability while operating in violation of air brake requirements.

It is our conclusion that there is no error in the record prejudicial to the rights of the defendant which would warrant a reversal of the judgment, and it is therefore affirmed.

*Judgment affirmed.*

BLOSSER, P. J., and MAUCK, J., concur.

Judges BLOSSER, MIDDLETON and MAUCK, of the Fourth Appellate District, sitting by designation in the Seventh Appellate District,